# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 17-0014V
### Filed: July 10, 2019
PUBLISHED

| | |
|---|---|
| ANTHONY CAPASSO,<br><br>               Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH<br>AND HUMAN SERVICES,<br><br>               Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Shealene Priscilla Mancuso, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Daniel Anthony Principato, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On January 4, 2017, Anthony Capasso ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa–10, *et seq.*[2] (the "Vaccine Act" or "Program"), alleging that as a result of receiving an influenza ("flu") vaccination on November 14, 2015, he suffered a shoulder injury related to vaccine administration ("SIRVA") to his left shoulder. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this published decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Masters.  For the reasons discussed below, the undersigned now finds that petitioner is entitled to compensation in the amount of $75,190.00.

I.      **Relevant Procedural History**[3]

Mr. Capasso filed his petition for compensation on January 4, 2017, with four medical record exhibits, alleging that the injuries he received to his left shoulder were caused by a flu vaccine he received on November 14, 2015.  Petition at 1.  (ECF No. 1).  Additional medical records and a Statement of Completion were filed in March 2017.  (ECF Nos. 8-11).

On June 12, 2017, respondent filed a status report stating that the records had been reviewed and that respondent found the case appropriate for settlement.  Respondent invited petitioner to send a settlement demand.  (ECF No. 15).  Over the next three months, the parties attempted to resolve this case through informal settlement discussions.  On September 8, 2017, petitioner filed a status report stating that the parties were at an impasse and requested a status conference.  (ECF No. 20).  To evaluate the issues in the case, the undersigned ordered respondent to file his report pursuant to Vaccine Rule 4(c).  (ECF No. 21).

On November 14, 2017, respondent filed his Rule 4(c) report stating that this case was not appropriate for compensation under the terms of the Vaccine Act for several reasons, including an inadequate onset period for a SIRVA injury, that petitioner had not satisfied the severity requirement of six months, and that there may have been an alternate cause for petitioner's shoulder injury.  (ECF No. 23).  Respondent also argued that because petitioner had not provided evidence that satisfied his burden of proof under *Althen*,[4] nor had petitioner provided an expert report or medical theory to support his claim, petitioner's claim for compensation should be denied.  After a status conference was held in the case, the parties agreed to submit briefs on entitlement and request a ruling.  (ECF No. 28).

On August 8, 2018, the undersigned issued findings of fact and a ruling on entitlement in petitioner's favor, resolving the issues of onset, the six-month severity requirement, and determining that petitioner was entitled to compensation.  (ECF No. 33)

On October 9, 2018, petitioner filed a status report stating that the parties "agreed as to the amount that Petitioner is entitled to for reimbursement of out of pocket medical expenses, but disagree on the amount for pain and suffering and lost wages" and proposed a schedule for filing damages briefs.  (ECF No. 37).  On April 17, 2018, a scheduling order was issued setting the proposed schedule for the parties to file briefs on damages.  (ECF No. 38).  The parties have filed their respective briefs and this case is now ripe for a determination regarding an award of damages.

---

[3] The undersigned adopts the comprehensive procedural history set forth in the Findings of Fact and Ruling on Entitlement issued on August 3, 2018.  *See Capasso v. Sec'y of Health & Human Servs.,* No. 17-0014V, 2018 WL 5077781, at *1-2 (Fed. Cl. Spec. Mstr. Aug. 3, 2018).

[4] *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005)

## II.     Relevant Factual History

### a.  Medical Records

In November 2015, Mr. Capasso (age 41) was working at Toray Plastics where he had been employed for more than 17 years.  Petitioner's Exhibit ("Pet. Ex.") 3 at 4; Pet. Ex. 8 at 1-2, ¶5.  Mr. Capasso's medical history does not mention any history of shoulder injuries and does not otherwise appear to be contributory to his claim in this case.

On November 14, 2015, Mr. Capasso received a flu vaccination in his left arm at a Rite Aid Pharmacy located in Portsmouth, Rhode Island.  Pet. Ex. 1 at 1; Pet. Ex. 2 at 16.  In his affidavit, Mr. Capasso stated that he felt some pain in his left shoulder the day after he was vaccinated which increased over the next couple of days.  Pet. Ex. 10 at 1.  He stated that approximately two to three days after vaccination, he woke up and noticed that the pain in his left shoulder from the prior night had become much more severe.  *Id*.  Mr. Capasso was unable to lift his left arm to put on his shirt and had to ask his wife for assistance.  He was unable to sleep that night due to the pain.  *Id*.

On December 3, 2015, 19 days later, Mr. Capasso presented to his primary care physician, Dr. Liza Famador, for complaints of left-sided shoulder pain after receiving a flu vaccination two to three weeks prior.  Pet. Ex. 2 at 17.  Mr. Capasso reported that he received the flu vaccine at Rite Aid on November 14, 2015, and later that night, had "swelling on the area until the next day."  *Id*.  He also noted pain while moving his left arm, putting on his seatbelt, and with flexion.  *Id*.  Upon examination, Mr. Capasso exhibited tenderness of the left shoulder.  *Id*.  At this time, Dr. Famador noted that petitioner had normal strength and normal range of motion of his left shoulder.  *Id*.  A diagnosis of contusion of the left deltoid region was made, and Mr. Capasso was advised to apply ice compressions to the affected area for 20 minutes, three times daily.  *Id*. at 18.  Dr. Famador also advised that Mr. Capasso perform range of motion ("ROM") exercises and take ibuprofen for pain.  *Id*.

Mr. Capasso presented for his annual exam on January 15, 2016.  Pet. Ex. 2 at 19.  At this visit, he complained that his left shoulder continued to bother him.  *Id*.  Dr. Famador again noted that Mr. Capasso's pain started after he received a flu shot in November.  *Id*.  The musculoskeletal portion of the physical exam documented tenderness of the left shoulder although Mr. Capasso still had normal range motion and normal strength of his left shoulder.  *Id*. at 20.  Dr. Famador also noted that there was no cervical adenopathy.  *Id*. at 21.  The assessment stated that while Mr. Capasso's left shoulder pain had improved, some discomfort was still present.  *Id*.  He was advised to continue using warm compresses and to perform a series of shoulder exercises and massages to treat his symptoms.  *Id*.  Dr. Famador also advised that petitioner may want to consider physical therapy if his shoulder pain did not improve.  *Id*.

On February 22, 2016, Mr. Capasso underwent an initial evaluation at University Orthopedics with physical therapist, Diane Jones.  Pet. Ex. 4 at 2.  Mr. Capasso reported that his shoulder became sore after receiving a flu shot in November 2015, and he reported experiencing severe pain at the time of examination (a range from 6 - 9 out of 10).  *Id*.  Mr. Capasso was noted to have certain impairments with the range of

3

motion of his left shoulder.  Specifically, he was noted to have moderate impairment with the passive range of motion ("PROM") of his glenohumeral joint with external rotation.  *Id*.  He also had mild impairment with his active range of motion ("AROM") with shoulder flexion, shoulder scaption, and shoulder external rotation.  Mr. Capasso was noted to have moderate levels of impairment of the AROM with shoulder abduction, shoulder horizontal adduction and shoulder internal rotation.  *Id*. at 3.  He had moderate weakness and decreased strength at a 3/5 level.  *Id*.  The evaluation notes indicate that Mr. Capasso was able to engage in moderate work duty but only at a 50% level.  He had mild difficulty reaching overhead and lifting and pulling light objects.  *Id*. at 3.  Mr. Capasso also reported moderate difficulty sleeping at night due to the pain.  *Id*.  The assessment was shoulder and upper arm mobility deficits associated with a sprain and strain.  *Id*. at 4.  The plan of care was for physical therapy for one visit per week for six weeks.  *Id*.

Mr. Capasso attended his first physical therapy session on March 1, 2016.  Pet. Ex. 4 at 6.  During this session, a positive finding on a special test used to evaluate shoulder injuries, the Hawkins-Kennedy test, was noted.  *Id*.  The abnormal range of motion of his left shoulder and pain levels were all noted to be the same as the initial consultation.  *Id*. at 6- 8.

Mr. Capasso continued to attend physical therapy sessions on March 7 and March 24.  At the March 7, 2016 session, his range of motion and pain levels continued to be substantially the same as the initial evaluation, although there was a slight improvement noted in his PROM.  Pet. Ex. 4 at 9-11.  By the March 24, 2017 session, it is noted that Mr. Capasso

> [H]as made good progress since [start of care] with return of full functional painfree AROM.  P[atient]'s strength has returned to 5 out of 5 without pain.  Continued slight scapular winging but has improved since beginning exercises with PT.  P[atien]t has returned to normal daily activities without pain and has met all goals initially set.  P[atien]t is indep[endent] with HEP [home exercise program] and will continue on maintenance program.

Pet. Ex. 4 at 15.  However, the undersigned notes that there were still some mild impairments documented with Mr. Capasso's AROM with shoulder flexion and shoulder abduction during this session.  *Id*. at 14.  Mr. Capasso was discharged and instructed to return to his referring physician if his symptoms returned.  *Id*. at 15.  In his affidavit, Mr. Capasso stated that his physical therapy sessions went well and he was able to continue working pain free.  However, the relief was short lived and he began to experience similar left shoulder pain a month later.  Pet. Ex. 10 at 2.

Mr. Capasso returned to Dr. Famador on June 3, 2016, with complaints of continued left shoulder pain.  Pet. Ex. 2 at 23.  Although Mr. Capasso underwent physical therapy in March 2016, he reported that his symptoms returned over the past 1-2 months.  Mr. Capasso reported that he had shooting pain in his left shoulder with certain activities such as rowing or when he was spreading concrete.  He reported that he was still performing his shoulder exercises at home.  *Id*.  His physical examination was positive for arthralgia and tenderness of the left shoulder, but Dr. Famador documented normal range of motion and normal strength during the examination.  *Id*. at

24. In the assessment, Dr. Famador recommended that Mr. Capasso return to his orthopedist for a repeat evaluation.  Id. at 16.  Dr. Famador stated that an MRI or steroid injection may be necessary.  *Id*.  Mr. Capasso was encouraged to continue performing his home exercise program and to resume using ice or heat over the shoulder area.  *Id*.

On July 6, 2016, Mr. Capasso underwent an MRI of his left shoulder.  Pet. Ex. 3 at 2.  The MRI was abnormal and showed a partial-thickness tearing and/or tendinopathy of the infraspinatus tendon.  There was no evidence of a full-thickness rotator cuff tear.  *Id*.

On August 11, 2016, Mr. Capasso was seen in follow-up by his primary care physician, Dr. Maher, for left shoulder pain and to review the results of the MRI.  Pet. Ex. 3 at 5.  Mr. Capasso's range of motion and strength levels were not documented in these notes.  *Id*.  The plan was for petitioner to continue with physical therapy, ibuprofen and to continue to be seen in follow up.  *Id*.  No additional medical records have been filed following this August 11, 2016 visit.

### b. Affidavit testimony

In his affidavit, Mr. Capasso stated that prior to his November 14, 2015 flu vaccination, he was very active, exercised regularly and ate well.  Pet. Ex. 10 at 2.  He said that he never had any sort of shoulder problems in the past, even after previous vaccinations.  *Id*.  Mr. Capasso explained how his shoulder injury affected his job.  He stated during the time he was experiencing his shoulder symptoms, he avoided working non-mandatory overtime because the pain was so severe.  *Id*. at 1-2.  However, he did work the mandatory overtime so that he would not lose income or his job.  He described how he asked his co-workers for assistance with strenuous tasks that required the use of his left arm and shoulder.  *Id*. at 2.  Mr. Capasso explained that while his pain affected his ability to perform his job, he continued to work and did not take any time off due to his injury because he took pride in his perfect attendance record.  Pet. Ex. 8 at 1-2.  He stated that he has not called out of work sick in the last seven years.  *Id*. at 2.  At the time of his vaccination, Mr. Capasso was only two months away from receiving an award for the fifth year in a row and he decided to work his way through the pain.  Pet. Ex. 9 at 1.  Mr. Capasso explained that he considers himself a model employee and has always excelled in his performance reviews.  *Id.*

His coworker, Mike Chianese, also confirmed that Mr. Capasso had asked for help with the "heavy lifting" due to his shoulder injury.  Pet. Ex. 9 at 1.  Mr. Chianese stated that Mr. Capasso "struggled with just normal duties" and that seeing him struggle at work was difficult, so he helped as much as he could.  *Id*.

Mr. Capasso's wife stated that initially, both she and her husband were going to receive flu shots on November 14, 2015, but she declined receiving a vaccine that day because she was unfamiliar with the pharmacist administering the vaccines.  Pet. Ex. 11.  After observing her husband receive his flu vaccine, Ms. Capasso stated that she "had a bad feeling."  *Id*.  She described how she observed her husband's shoulder become swollen and sore to the touch at the injection site.  *Id*.  She also explained that his pain became so severe that she had to help her husband dress into his clothes in the morning.  *Id*.  By February 2016, Ms. Capasso stated that her husband's condition

had deteriorated.  *Id*.  She now had to do all the chores around the home that required
any lifting, including shoveling snow.  *Id*. at 1-2.  Ms. Capasso stated that her husband
was very diligent about his physical therapy and while his pain and strength improved
after therapy, within a month of leaving therapy, his pain returned.  *Id*. at 2.  Ms.
Capasso described that when their daughter moved back home from college from her
freshman year in the summer of 2016, her husband was unable to help with moving her
furniture because of the risk of further injuring his shoulder.  *Id*.  He was unable to go
out on their row boat that summer and he was unable to golf, one of his favorite
activities.  *Id*.  Ms. Capasso stated that even today, two and half years later, her
husband still performs exercises that are part of his home exercise program for his
shoulder.  *Id*.

## III.    Party Contentions

Petitioner seeks an award in the amount of $90,190.00, consisting of $90,000.00
as compensation for his pain and suffering, and $190.00 for past unreimbursable
medical expenses.  Petitioner's Brief in Support of Damages ("Pet. Brief") at 1 (ECF No.
41).  Petitioner has confirmed that he is not seeking compensation for lost wages or
future medical expenses.  In his brief and affidavit, petitioner stresses the degree to
which his injury impacted his life beyond what is, or would be, reflected in his medical
records.  *Id*. at 1 (ECF No. 41); Pet. Ex. 10 at 1.

Respondent argues that petitioner should be awarded $45,000.00 as
compensation for his actual pain and suffering, in addition to the $190.00 in
unreimbursable expenses to which the parties have agreed.  Respondent's Brief on
Damages ("Res. Brief") at 1 (ECF No. 44).  He maintains that "[p]etitioner sustained a
relatively minor injury and received relatively little treatment."  *Id*. at 6.  He argues that
while petitioner reported his pain to his primary care physician within three weeks of his
vaccination, his subsequent physical examinations did not demonstrate that he was
experiencing significant deficits as a result of his SIRVA.  *Id*.  Respondent also argues
that although petitioner's pain returned and he was ultimately diagnosed with "partial-
thickness tearing and/or tendinopathy of the infraspinatus," he fully recovered by August
2016, and thus, fully recovered within a year.  *Id*.

Comparing petitioner's facts to those in *Desrosier, Dirksen, Knauss,* and *Marino*,[5]
respondent asserts "all four of these cases are factually distinguishable."  *Id*.  Instead,
respondent notes that the amount offered by respondent is supported with proffers
agreed to by petitioner's counsel in other cases with more severe clinical courses.  *See,
e.g.*, *Zebofsky v. Sec'y of Health & Human Servs.*, No. 15-1084V, 2017 WL 8682428, at
*1 (Fed. Cl. Spec. Mstr. Dec. 1, 2017), ($55,000.00 awarded to a petitioner who had two

---

[5] *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr.
Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical
expenses; *Dirksen v. Sec'y of Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec.
Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $6,784.56 in past unreimbursable
medical expenses); *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed.
Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in
unreimbursable medical expenses); *Marino v. Sec'y of Health & Human Servs.*, No. 16-622V, 2018 WL
2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in
unreimbursable medical expenses).

steroids injections, one round of PT spanning two months, and documented shoulder pain lasting approximately seven months per the submitted medical records).[6]  Res. Brief at 8-9.

## IV.  Discussion and Analysis

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).  Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B).  Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y Health & Human Servs.*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on his daily life. *Shapiro v. Sec'y Health & Human Servs.*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.")

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).  In evaluating these factors, the undersigned has reviewed the entire record, including medical records, affidavits submitted by petitioner and others, and the parties' briefs.

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.").  And, of course, the undersigned also may

---

[6] The facts described above are not found in the decision awarding compensation (which is based on a proffer) but are set forth in the ruling on entitlement. *See Zebofsky v. Sec'y of Health & Human Servs.*, No. 15-1084V, 2017 WL 7051381, at *4-5 (Fed. Cl. Spec. Mstr. Sept. 28, 2017).

rely on her own experience adjudicating similar claims.[7]  *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, it must be stressed that pain and suffering is not determined based on a continuum.  *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, the Court rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  The Court noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  *Graves*, 109 Fed. Cl. at 590.  Instead, the Court assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  *Id*. at 595.

### A.  History of SIRVA Settlement and Proffer

SIRVA cases have an extensive history of informal resolution within the SPU.  As of January 1, 2019, 1,023 SIRVA cases have informally resolved[8] within the Special Processing Unit since its inception in July of 2014.[9]  Of those cases, 602 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[10]  Additionally, 395 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $77,000.00 to $125,000.00.[11]  The median award is $100,000.00.  In most instances, these awards are presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering.

---

[7] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell.  Since that time, all SPU cases, including the majority of SIRVA claims, have remained on the undersigned's docket.

[8] Additionally, 31 claims alleging SIRVA have been dismissed within the SPU.

[9] In *Kim, infra*, and *Young, infra*, the undersigned previously described SPU SIRVA case resolutions through July 1, 2018.

[10] Additionally, there have been 16 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[11] Typical range refers to cases within the second and third quartiles.  Additional outlier awards also exist.  The full range of awards spans from $25,000.00 to $1,845,047.00.  Among the 16 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $122,886.42.  For these awards, the second and third quartiles range from $90,000.00 to $160,502.39.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $95,000.00.[12]  The median award is $70,000.00.  As with proffered cases, in most instances, stipulated awards are presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering.  Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

## B.  Prior Decisions Addressing SIRVA Damages

In addition to the extensive history of informal resolution, the undersigned has also issued 14 reasoned decisions as of the end of March of 2019 addressing the appropriate amount of compensation in prior SIRVA cases within the SPU.[13]

### i.   Below-median awards limited to past pain and suffering

In six prior SPU cases, the undersigned has awarded compensation for pain and suffering limited to compensation for actual or past pain and suffering that has fallen below the amount of the median proffer discussed above.  These awards ranged from $60,000.00 to $85,000.00.[14]  These cases have all included injuries with a "good" prognosis, albeit in some instances with some residual pain.  All of these cases had only mild to moderate limitations in range of motion and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis or edema.

---

[12] Typical range refers to cases within the second and third quartiles.  Additional outlier awards also exist.  The full range of awards spans from $5,000.00 to $509,552.31.  Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

[13] An additional case, *Young v. Sec'y Health & Human Servs.*, No. 15-1241V, was removed from the SPU due to the protracted nature of the damages phase of that case.  In that case the undersigned awarded $100,000.00 in compensation for past pain and suffering and $2,293.15 for past unreimbursed expenses. 2019 WL 664495 (Fed. Cl. Spec. Mstr. Jan. 22, 2019).  A separate reasoned ruling addressed the amount awarded. *Young v. Sec'y Health & Human Servs.*, No. 15-1241V, 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019).

[14] These cases are:  *Knauss v. Sec'y Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Marino v. Sec'y Health & Human Servs.*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Attig v. Sec'y Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019)(awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); *Kim v. Sec'y Health & Human Servs.*, No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Desrosiers v. Sec'y Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); *Dirksen v. Sec'y Health & Human Servs.*, No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses).

The duration of injury ranged from seven to 21 months and, on average, these petitioners saw between 11 and 12 months of pain.

Significant pain was reported in these cases for up to eight months.  However, in most cases, these petitioners subjectively rated their pain as six or below on a ten-point scale.  Only the petitioners in *Kim* and *Attig* reported pain at the upper end of the ten-point scale.  Most of these petitioners pursued physical therapy for two months or less and none had any surgery.  Only two (*Attig* and *Marino*) had cortisone injections.  Several of these cases (*Knauss*, *Marino*, *Kim* and *Dirksen*) delayed in seeking treatment.  These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

Two of the petitioners (*Marino* and *Desrosiers*) had significant lifestyle factors that contributed to their awards.  In *Marino*, petitioner presented evidence that her SIRVA interfered with her avid tennis hobby.  In *Desrosiers*, petitioner presented evidence that her pregnancy and childbirth prevented her from immediately seeking full treatment of her injury.

### ii.    Above-median awards limited to past pain and suffering

Additionally, in five prior SPU cases, the undersigned has awarded compensation limited to past pain and suffering falling above the median proffered SIRVA award.  These awards have ranged from $110,000.00 to $160,000.00.[15]  Like those in the preceding group, prognosis was "good."  However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or by the need for surgical repair.  Four out of five underwent some form of shoulder surgery while the fifth (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment.  On the whole, MRI imaging in these cases also showed more significant findings.  In four out of five cases, MRI imaging showed possible evidence of partial tearing.[16]  No MRI study was performed in the *Cooper* case.

---

[15] These cases are: *Cooper v. Sec'y Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Knudson v. Sec'y Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Collado v. Sec'y Health & Human Servs.*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses); *Dobbins v. Sec'y Health & Human Servs.*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses).

[16] In *Reed*, MRI showed edema in the infraspinatus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head.  In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glen humeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies.  In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus.  In Knudson, MRI showed mild

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion.  Moreover, these petitioners tended to seek treatment of their injuries more immediately.  Time to first treatment ranged from five days to 43 days.  Duration of physical therapy ranged from one to 24 months and three out of the five had cortisone injections.

### iii.    Awards including compensation for both past and future pain and suffering

In three prior SPU SIRVA cases, the undersigned has awarded compensation for both past and future pain and suffering.[17]  In two of those cases (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain.  The *Hooper* petitioner underwent surgery while in *Binette* petitioner was deemed not a candidate for surgery following an arthrogram.  Despite significant physical therapy (and surgery in *Hooper*), medical opinion indicated that their disability would be permanent.  In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies.  In the third case (*Dhanoa*), petitioner's injury was less severe than in *Hooper* or *Binette*; however, petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis.  The undersigned awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded one-year of projected pain and suffering.

## V.    Appropriate Compensation in this SIRVA Case

In the experience of the undersigned, awareness of suffering is not typically a disputed issue in cases involving SIRVA.  In this case, neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering and the undersigned finds that this matter is not in dispute.  Thus, based on the circumstances of this case, the undersigned determines that petitioner had full

---

longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

[17] These cases are: *Dhanoa v. Sec'y Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y Health & Human Servs.*, No. 16-731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); and *Hooper v. Sec'y Health & Human Servs.*, No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

awareness of his suffering and proceeds to analyze the severity and duration of the injury.

### a. Severity of Pain and Suffering

### i. Affidavit Testimony

With respect to the severity of petitioner's injury, Mr. Capasso's affidavit provides a description of the pain throughout the duration of his injury. Pet. Ex. 10.  In his affidavit, Mr. Capasso stated that prior to his November 14, 2015 flu vaccination, he was very active, exercised regularly and ate well.  *Id*. at 2.  He never had any sort of shoulder problems in the past, even after previous vaccinations.  *Id*.

In the initial days following the November 14, 2015 vaccination, Mr. Capasso described the sharp pain he felt in his left shoulder, especially when he tried to lift his arm, such as when he was dressing.  Pet. Ex. 10 at 1.  He described the pain as so severe that he needed his wife to help him get dressed for work and he hoped for a light day of physical work.  *Id*.  In the weeks following the injury, Mr. Capasso stated that he would avoid overtime if possible by "giving it away" because the pain in his shoulder was too severe.  *Id*.  When he did work overtime, he stated that he asked his co-workers for assistance with certain strenuous tasks that required the use of his shoulder.  *Id*. at 2.

His coworker, Mike Chianese, also filed an affidavit confirming that Mr. Capasso had asked him to help with the "heavy lifting" due to his shoulder injury.  Pet. Ex. 9 at 1.  Mr. Chianese stated that Mr. Capasso "struggled with just normal duties" and that seeing him struggle at work was difficult, so he helped as much as he could.  *Id*.  Mr. Capasso explained that while his pain affected his ability to perform his job, he continued to work and did not take any time off due to his injury because he took pride in his perfect attendance record.  Pet. Ex. 8 at 1-2. He stated that he has not called out of work sick in seven years.  *Id*. at 2.  At the time of his vaccination, he was only two months away from receiving an award for the fifth year in a row and he decided to work his way through the pain.  Pet. Ex. 9 at 1.  Mr. Capasso explained that he considers himself a model employee and has always excelled in his performance reviews.  *Id*.

Mr. Capasso also filed an affidavit from his wife, Andrea Capasso.  Pet. Ex. 11.  She described how she observed her husband's shoulder become swollen and sore to the touch at the injection site.  *Id*. at 1.  She also explained that his pain became so severe that she had to help her husband dress into his clothes in the morning.  *Id*.  By February 2016, Ms. Capasso stated that her husband's condition had deteriorated.  She now had to do all the chores around the home that required any lifting, including shoveling snow.  *Id*. at 1-2.  Ms. Capasso stated that her husband was very diligent about his physical therapy and while his pain and strength improved after therapy, within a month of leaving therapy, his pain returned.  *Id*. at 2.  Ms. Capasso described that when their daughter moved back home from college from her freshman year in the summer of 2016, her husband was unable to help with moving the furniture because of the risk of further injuring his shoulder.  *Id*.  He was unable to go out on their row boat that summer and he was unable to golf, one of his favorite activities.  *Id*.  Ms. Capasso

states that even today, two and half years later, her husband still performs shoulder exercises that are part of his home exercise program for his shoulder.  *Id*.

## ii.  Medical Record Evidence

The undersigned acknowledges and finds that Mr. Capasso suffered severe shoulder pain from the time he received the flu vaccination at issue on November 14, 2015, to January 15, 2016, where it was documented that Mr. Capasso's left shoulder pain had improved and only continued to bother him "a little" – an approximately two-month period.  He first sought treatment approximately 19 days after vaccination.  Pet. Ex. 2 at 17.  At that time, he demonstrated normal strength and normal range of motion of his left shoulder, although he did exhibit tenderness of the left shoulder (although no pain level rating was provided).  *Id*.  He was diagnosed with a contusion of the left deltoid region and advised to apply ice, perform range of motion exercise and take ibuprofen for pain.

Mr. Capasso sought treatment for his shoulder two months later, on January 15, 2016, when during his annual physical exam when he reported that his shoulder continued to cause some discomfort and bothered him "a little", but the pain had improved.  Pet. Ex. 2 at 19.  At this appointment, he continued to exhibit tenderness to his left shoulder although he still had normal range of motion and normal strength of his left shoulder.  *Id*. at 20.

Over the next month, Mr. Capasso's symptoms substantially worsened and he reported severe pain (a range of 6-9 out of 10).  Pet. Ex. 4 at 2.  At his initial physical therapy evaluation appointment on February 22, 2016, he began exhibiting impairments with the range of motion of his left shoulder.  *Id*.  The evaluation notes indicated that Mr. Capasso was able to engage in moderate work duty but only at a 50% level.  *Id*. at 3.  The plan of care was for physical therapy for one visit per week for six weeks.  *Id*.

Mr. Capasso attended three physical therapy appointments on March 1, 7 and March 24, 2016.  By the March 24, 2017 session, it is noted that Mr. Capasso

> [Had] made good progress since [start of care] with return of full functional painfree AROM.  P[atient']s strength has returned to 5 out of 5 without pain.  Continued slight scapular winging but has improved since beginning exercises with PT.  P[atien]t has returned to normal daily activities without pain and has met all goals initial set.  P[atien]t is indep[endent] with HEP [home exercise program] and will continue on maintenance program.

Pet. Ex. 4 at 15.  However, the undersigned notes that there were still some mild impairments documented with Mr. Capasso's active range of motion with shoulder flexion and shoulder abduction during this session.  *Id*. at 14.  Mr. Capasso was discharged and instructed to return to his referring physician if his symptoms returned.  *Id*. at 15.  In his affidavit, Mr. Capasso stated that his physical therapy sessions went well and he could continue working pain free.  However, the relief was short lived and he began to experience similar pain a month later.  Pet. Ex. 10 at 2.

Mr. Capasso returned to Dr. Famador on June 3, 2016, with complaints of continued left shoulder pain.  Pet. Ex. 2 at 23.  Although he underwent physical therapy in March 2016, his symptoms returned over the past 1-2 months.  Mr. Capasso reported that he had shooting pain from his left shoulder with certain activities such as rowing or when he was spreading concrete.  A July 6, 2016 MRI of his left shoulder showed a partial-thickness tearing and/or tendinopathy of the infraspinatus.  Pet. Ex. 3 at 2.  By his August 11, 2016 appointment with his primary care physician, the plan was for Mr. Capasso to continue with physical therapy, ibuprofen and to be seen in follow up.  Pet. Ex. 3 at 5.

### b.  Duration of Pain and Suffering

In this case, petitioner's injury is less severe and of a shorter duration than those injuries which have warranted higher awards for pain and suffering.  Indeed, petitioner's medical history closely aligns with those SIRVA cases described above which have received below-median awards.

In total, petitioner experienced approximately eight months of documented pain and suffering.  Mr. Capasso's severe level of shoulder pain improved after two months; however, this improvement was short-lived.  His pain returned to a severe level and maintained this severe level for the next approximately four months.  Mr. Capasso's MRI on July 6, 2016, demonstrated a partial-thickness tearing and/or tendinopathy of the infraspinatus.  In his affidavit, Mr. Capasso stated that by August 2016, his "shoulder felt fully recovered, where it was tested through many mandatory overtime hours and getting through these pain free."  Pet. Ex. 10. at 2.  He stated that he returned to planning some home projects and resumed playing golf.  *Id.*

The above-described course of petitioner's condition is very similar to the prior *Kim*, *Marino*, and *Attig* cases, all of which were awarded damages below the median award for proffered SIRVA cases.  In those cases, petitioners experienced from seven to 15 total months of pain and suffering.  However, unlike this case, the *Kim* and *Attig* petitioners reported only one to three months of significant pain and all four cases included MRI findings consistent with a milder type injury.  Mr. Capasso experienced four to six months of severe pain and his MRI demonstrated a more severe type of injury.  Although Mr. Capasso only attended four physical therapy appointments, he and his wife averred that he was diligent with his home exercise program.  His diligence with his home exercise program may have contributed to improvement of his symptoms similar to what he would have accomplished in formal physical therapy.  Looking at the record as a whole, these distinctions provide preponderant evidence that Mr. Capasso experienced a more severe injury than the above-mentioned petitioners.

In light of all of the above, and based on the record as a whole, the undersigned finds that $75,000.00 in compensation for past pain and suffering is reasonable and appropriate in this case.

### B. Award for Past Unreimbursed Expenses

Mr. Capasso requests $190.00 in past unreimbursable expenses.  Pet. Brief at 1; Pet. Ex. 6.  In his brief, respondent agrees to this amount.  Res. Brief at 4-5, 10.  Thus, petitioner is awarded $190.00 for his past unreimbursable expenses.

### C. Amount of the Award

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  For all the reasons discussed above, the undersigned finds that $75,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering.  In addition, the undersigned finds that petitioner is entitled to compensation for $190.00 for his past unreimbursed medical expenses.

### VI.    Conclusion

In light of all of the above, the undersigned awards **petitioner a lump sum payment of $75,190.00,** (representing $75,000.00 for petitioner's actual pain and suffering and $190.00 for unreimbursable medical expenses) **in the form of a check payable to petitioner, Anthony Capasso.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).  *Id.*

The clerk of the court is directed to enter judgment in accordance with this decision.[18]

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master

---

[18] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.